1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MAI VANG,

11              Plaintiff,                No. CIV S-08-2557 DAD

12        vs.

13   MICHAEL J. ASTRUE,                   <u>ORDER</u>
     Commissioner of Social Security,
14
                Defendant.
15   _____/

16           This social security action was submitted to the court without oral argument for

17   ruling on plaintiff's motion for summary judgment and defendant's cross-motion for summary

18   judgment.  For the reasons explained below, plaintiff's motion is granted, the decision of the

19   Commissioner of Social Security (the Commissioner) is reversed, and the matter is remanded for

20   further proceedings consistent with this order.

21                          **PROCEDURAL BACKGROUND**

22           On March 7, 2006, plaintiff Mai Vang applied for Supplemental Security Income

23   (SSI) under Title XVI of the Social Security Act (the Act), alleging that she became disabled on

24   December 11, 2003.  (Transcript (Tr.) at 53-60.)  Plaintiff claimed disability based on low back

25   pain, pain in the area of her C-section scars, depression, a sleeping problem, slow learning, poor

26   concentration, poor memory, dizziness, and headaches.  (Tr. at 38.)  Plaintiff's application was

1

denied by the agency initially in December 2006 and upon reconsideration in May 2007. (Tr. at 38-43, 30-34.) A hearing was held before an Administrative Law Judge (ALJ) on March 6, 2008. (Tr. at 337-51.) Plaintiff was represented at the hearing by a non-attorney and testified through an interpreter. (Id.) In a decision issued on April 30, 2008, the ALJ found plaintiff not disabled. (Tr. at 7-16.) The ALJ entered the following findings:

> 1. The claimant has not engaged in substantial gainful activity since March 7, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).
>
> 2. The claimant has the following severe combination of impairments: mild degenerative disc disease of the lumbar spine, GERD, and hypertension (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).
>
> 5. The claimant has no past relevant work (20 CFR 416.965).
>
> 6. The claimant was born on January 1, 1969 and is 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).
>
> 7. The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English.
>
> 8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).
>
> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, since March 7, 2006, the date the application was filed (20 CFR 416.920(g)).

(Tr. at 12-16.)

On August 28, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby making that decision the final decision of the Commissioner.  (Tr. at 2-4.)  Plaintiff sought judicial review pursuant to 42 U.S.C. § 405(g) by filing the complaint in this action on October 27, 2008.

## LEGAL STANDARD

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record as a whole and the proper legal standards were applied.  Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).  The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Morgan, 169 F.3d at 599); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).

A reviewing court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion.  Jones, 760 F.2d at 995.  The court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence.  Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal standard was applied in weighing the evidence, Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

In determining whether or not a claimant is disabled, the ALJ should apply the five-step sequential evaluation process established under Title 20 of the Code of Federal

1   Regulations, Sections 404.1520 and 416.920.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

2   The five-step process has been summarized as follows:

3           Step one:  Is the claimant engaging in substantial gainful activity?
            If so, the claimant is found not disabled.  If not, proceed to step
4           two.

5           Step two:  Does the claimant have a "severe" impairment?  If so,
            proceed to step three.  If not, then a finding of not disabled is
6           appropriate.

7           Step three:  Does the claimant's impairment or combination of
            impairments meet or equal an impairment listed in 20 C.F.R., Pt.
8           404, Subpt. P, App. 1?  If so, the claimant is automatically
            determined disabled.  If not, proceed to step four.
9
            Step four:  Is the claimant capable of performing his past work?  If
10          so, the claimant is not disabled.  If not, proceed to step five.

11          Step five:  Does the claimant have the residual functional capacity
            to perform any other work?  If so, the claimant is not disabled.  If
12          not, the claimant is disabled.

13  <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

14          The claimant bears the burden of proof in the first four steps of the sequential

15  evaluation process.  <u>Yuckert</u>, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the

16  sequential evaluation process proceeds to step five.  <u>Id.</u>; <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098

17  (9th Cir. 1999).

18                                      **APPLICATION**

19          Plaintiff Mai Vang advances three arguments in her motion for summary

20  judgment.  First, plaintiff asserts that the ALJ rejected the opinions of her treating physician and

21  found her mental impairment to be nonsevere without a legitimate basis for so doing.  Second,

22  plaintiff contends that the ALJ failed to properly evaluate and credit her testimony and the third-

23  party statements of her son regarding the nature and extent of her functional limitations.  Third,

24  plaintiff argues that the ALJ erred in utilizing the grids instead of securing the testimony of a

25  vocational expert.  The court addresses plaintiff's arguments below.

26  /////

                                             4

I.      **Step Two:  Determination of Severe Impairments**

Plaintiff's first argument is a challenge to determinations made by the ALJ at step two of the sequential evaluation process.  At this step, the ALJ must determine if the claimant has a medically severe impairment or combination of impairments.  Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing Yuckert, 482 U.S. at 140-41).  The Commissioner's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a) & 416.921(a).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," and those abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, and carrying, (2) capacities for seeing, hearing, and speaking, (3) understanding, carrying out, and remembering simple instructions, (4) use of judgment, (5) responding appropriately to supervision, co-workers, and usual work situations, and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Supreme Court has recognized that the Commissioner's "severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account."  Yuckert, 482 U.S. at 153.  However, the regulation must not be used to prematurely disqualify a claimant.  Id. at 158 (O'Connor, J., concurring).

To prevent the premature disqualification of claimants, "[a]n impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'"  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Smolen, 80 F.3d at 1290, and adding emphasis).  "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process."  Social Security Ruling (SSR) 85-28, 1985 WL 56856, at *3.  "Step two, then, is 'a de minimis screening device [used]

1  to dispose of groundless claims[.]'" <u>Webb</u>, 433 F.3d at 687 (quoting <u>Smolen</u>, 80 F.3d at 1290).

2  <u>See also</u> <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1158-59 (9th Cir. 2001); <u>Tomasek v. Astrue</u>, No.

3  C-06-07805 JCS, 2008 WL 361129, at *13 (N.D. Cal. Feb. 11, 2008) (describing claimant's

4  burden at step two as "low").

5          Here, the ALJ found three physical impairments that, in combination, cause

6  significant limitations in plaintiff's ability to perform basic work activities:  mild degenerative

7  disc disease of the lumbar spine, gastroesophogeal reflux disease (GERD), and hypertension.

8  (Tr. at 12.)  The ALJ considered plaintiff's allegations of mental impairment but concluded that

9  plaintiff's "medically determinable mental impairments of depressive disorder and PTSD do not

10  cause more than minimal limitation in the claimant's ability to perform basic mental work

11  activities and is therefore nonsevere."  (Tr. at 13.)

12          The ALJ commenced the analysis of plaintiff's mental impairments with the

13  finding that prior to October 2006 "[t]here was no evidence of any [mental] impairment at all as

14  she had not undergone any treatment or made any allegations to her treating source."  (Tr. at 12.)

15  Because of plaintiff's allegation of mental impairments, however, a consultative psychological

16  examination was ordered by the state agency, and plaintiff was seen on October 16, 2006, by

17  Janice Nakagawa, Ph.D., a licensed psychologist.  The ALJ summarized Dr. Nakagawa's report

18  as follows:

19          On testing, the claimant put forth inconsistent effort which was
        consistent with a person who was attempting to present herself in
20          the worst possible light.  In all tests of WMS-III, Bender Gestalt II
        and Trail Making Test, all results were positive for malingering.
21          As a result of that finding, the Test of Memory Malingering
        (TOMM) was administered with the results finding that she was
22          clearly malingering.  Dr. Nakagawa concluded that due to
        malingering, all test results were invalid.  The only diagnosis was
23          malingering with no other impairment.

24  (Tr. at 12 (citation omitted).)

25          Next, the ALJ found that plaintiff "did not begin any treatment for mental health

26  until August 15, 2007," when she was seen by Russell Lim, M.D., at Sacramento County Mental

Health Clinic.  (Tr. at 12.)  The ALJ described Dr. Lim's initial psychiatric evaluation as follows:

> Clinical findings were a sad mood and [plaintiff's] affect was congruent, but somewhat flat.  Her thought content was on her back pain, insomnia and she was culturally isolated.  Her insight and judgment were fair.  She had no suicidal ideations.  She was diagnosed with major depressive disorder, single episode, and PTSD, and prescribed Remeron and later Lexapro.

(Tr. at 12.)  The ALJ, whose decision was issued on April 30, 2008, observed that plaintiff was seen "only a few times" after beginning treatment on August 15, 2007, and that "by September 2007, Dr. Lim noted that she was having improvement in her symptoms as well as sleeping better," that "[h]er insight and judgment were good," and that her cognitive functioning was intact.  (Tr. at 12-13.)

The ALJ concluded his step-two analysis with a discussion of the functional areas that must be considered when evaluating mental disorders:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  (Tr. at 13) (citing 20 C.F.R., Part 404, Subpart P, App. 1,§ 12.00C).  The ALJ opined as follows with regard to plaintiff's mental functioning:

> [T]he undersigned finds that her mental condition has not significantly limited her ability to understand, remember and carry out simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, or to deal with changes in routine work settings.
>
> In the four areas of functioning, she has no more than mild limitations in daily activities, social functioning and in concentration, persistence and pace and has not experienced any episodes of decompensation.  As shown above in treating records, clinical findings are very mild.  The undersigned finds that the claimant may experience some depressive symptoms, such as sleep disturbance, decreased energy, and anhedonia that are consistent with a depressive disorder; however, these symptoms do not impact her activities more than minimally.  She has seven children still at home, including a toddler and other young children. Young children can be quite demanding both physically and mentally. While she alleges that she does not care for them, that the older children care for the younger children, her credibility is suspect following her lack of cooperation at the mental examination.  First, allegedly limited daily activities cannot be objectively verified with

7

1    any reasonable degree of certainty.  Second, even if the claimant's
    daily activities are truly as limited as alleged, it is difficult to
2    attribute that degree of limitation to the claimant's medical
    condition, as opposed to other reasons, in view of the relatively
3    weak medical evidence and other factors discussed in this decision.
    Overall, the claimant's reported limited daily activities, social
4    activities, and concentration, persistence and pace are considered to
    be outweighed by the other factors discussed in this decision.

5

6    Because the claimant's medically determinable mental impairment
    causes no more than "mild" limitation in any of the first three
    functional areas and "no" limitation in the fourth area, it is
7    nonsevere (20 CFR 416.920a(d)(1)).

8 (Tr. at 13.)  The ALJ concluded that plaintiff's "medically determinable mental impairment [sic]

9 of depressive disorder and PTSD do not cause more than minimal limitation in the claimant's

10 ability to perform basic mental work activities and is therefore nonsevere." (Id.)

11    The court finds that the ALJ's findings are not supported by the record.  First,

12 medical records from Hmong New Life Center (HNLC) and Sacramento Family Medical Clinic

13 (SFMC) from 2005 through 2007 contradict the ALJ's finding that prior to October 2006 there

14 was no evidence of any mental impairment at all "as [plaintiff] had not undergone any treatment

15 or made any allegations to her treating source."  (Tr. at 12.)  On March 1, 2005, plaintiff was

16 seen at SFMC for the purpose of establishing herself with a doctor.  At that time, plaintiff was

17 almost nine months pregnant and had previously been seen in the prenatal clinic; she was

18 diagnosed with edema, pregnancy, and anorexia.  (Tr. at 333.)  When plaintiff was seen for

19 complaints of chronic lower back pain and stomach pain on November 4, 2005, medical staff

20 noted that plaintiff was mildly depressed.  (Tr. at 332.)  On December 11, 2005, plaintiff was

21 seen for back pain, stomach pain, poor sleep, and difficulty walking; again, she was observed to

22 be depressed.  (Tr. at 331.)  Throughout 2006 and 2007, plaintiff was seen regularly and

23 sometimes complained of feeling depressed; she was regularly found to be depressed or sad.  (Tr.

24 at 328-32, 251-59, 248, 223-38.).  On February 1, 2007, plaintiff was referred to "mental health

25 at Southeast Asian Center."  (Tr. at 251.)  These records reflect that treating medical staff found

26 plaintiff to be depressed as early as November 2005, that plaintiff made allegations of depression

to treating sources almost a year prior to October 2006, and that plaintiff was referred for mental health treatment in early 2007.

Second, the medical records contradict the ALJ's finding that plaintiff "did not begin any treatment for mental health until August 15, 2007," when Dr. Lim assessed her at the Sacramento County Mental Health Clinic and prescribed psychotropic medication.  As noted supra, treating medical staff at SFMC referred plaintiff to the Southeast Asian Center on February 1, 2007, and Dr. Lim noted in his initial psychiatric evaluation on August 15, 2007, that plaintiff was "receiving 1:1 therapy and group therapy via Calworks which she does find beneficial."  (Tr. at 251, 215, 218.)  The record also contains a record of a first visit for mental health treatment on June 26, 2007.  (Tr. at 109-14.)  Moreover, even if plaintiff had not begun treatment prior to August 15, 2007, "'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'"  Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Third, due to the invalidity of all of Dr. Nakagawa's test results, those results do not support any conclusions about plaintiff's mental functioning.  In addition, Dr. Nakagawa's testing was limited due to plaintiff's lack of proficiency in English,[1] and translation issues may have been a factor in the test results.  Dr. Nakagawa was unable to make any diagnosis other than malingering after she concluded that plaintiff put forth inconsistent effort that was consistent with a person who is attempting to present in the worst possible light, that plaintiff approached the test task for the WAIS-III Performance tests "in a way that suggested malingering," that plaintiff "put forth haphazard, poor effort" on the Bender Gestalt-II test, and that plaintiff had inconsistent recall from Trial One to Trial Two of the Test of Memory Malingering, "clearly indicating malingering."  (Tr. at 298-99.)  Dr. Nakagawa advised that it was impossible for her to

---

[1] Dr. Nakagawa administered only the performance-based portions of the WAIS-III test and only Part A on the Trail Making Test.  (Tr. at 298-99.)

1   provide an accurate assessment of plaintiff's functional capabilities with respect to work.  (Tr. at

2   299.)

3           Fourth, the August 15, 2007 psychiatric evaluation of plaintiff by her treating

4   psychiatrist sets forth clinical findings far more severe than those mentioned in the ALJ's

5   description of that evaluation.  (Tr. at 12, 214-19.)  Dr. Lim described plaintiff's mood as

6   "sad/depressed," while the ALJ cited only "a sad mood."  (Tr. at 12, 217.)  Dr. Lim described

7   plaintiff's thought content as back pain, sleep disturbance, dreams, inability to care for self, and

8   cultural isolation, along with some paranoia concerning spirits coming to take her away, while

9   the ALJ described plaintiff's thought content as back pain, insomnia, and cultural isolation.  (Tr.

10  at 12, 217.)  Although the ALJ accurately reported Dr. Lim's clinical finding that plaintiff's

11  insight and judgment were fair, the ALJ did not note Dr. Lim's observation that plaintiff's insight

12  included being aware of her mood status and seeking help.  (Tr. at 12, 217.)  The ALJ correctly

13  reported that Dr. Lim prescribed Remeron and later Lexapro, but did not note that both are

14  antidepressants classified as psychotropic drugs.  (Tr. at 12, 214.)

15          Although the ALJ mentions that plaintiff "was diagnosed with major depressive

16  disorder, single episode, and PTSD," the ALJ failed to discuss any of Dr. Lim's extensive

17  findings in support of his diagnosis of post-traumatic stress disorder:  plaintiff's complaints of

18  flashbacks from the war, inability to sleep more than 3 to 4 hours a night, difficulty falling asleep

19  because of "thinking too much" and the fear of having dreams, "recurrent nightmares for many

20  years of watching her mother die in front of her eyes, vivid images of blood, loud noises, and her

21  mother changing into 'something scary . . . spirit' trying to take her away," awakening from sleep

22  with her heart pounding and feeling that the dream was real, and memories of the war, which

23  included killing during the daytime, causing her to avoid farming in the refugee camps in

24  Thailand and causing her to avoid loud noises and craftwork in the U.S. because these activities

25  trigger flashbacks.  (Tr. at 215.)  Dr. Lim, who found plaintiff to be reliable and cooperative,

26  recorded that plaintiff witnessed her mother and aunt killed in the war when plaintiff was 12, and

that her father died that same year fighting in the war.  (Tr. at 215-17.)  Dr. Lim's impression was that plaintiff's present symptoms "appear to be most consistent with PTSD from war experiences, continued hyperarousal and significant disturbance" and that she "is clearly depressed."  (Tr. at 218.)  Dr. Lim diagnosed major depressive disorder and PTSD, and prescribed Remeron to treat plaintiff's depressed mood, sleep disturbance and PTSD symptoms.  (Tr. at 218.)  The ALJ's step-two analysis of plaintiff's mental impairments contains only two mentions of PTSD and no discussion of the disorder or its effects on mental functioning.  (Tr. at 12-13.)

Fifth, the ALJ's suggestion of significant improvement in plaintiff's mental condition after she was seen by Dr. Lim only a few times is in conflict with the psychiatric treatment records and reflects a highly selective treatment of those records.  (Tr. at 12-13, 214-19.)  The ALJ noted only "improvement in her symptoms as well as sleeping better," good insight and judgment, and intact cognitive functioning.  (Tr. at 13.)  In contrast, the medical records reflect that when plaintiff was seen for her first follow-up appointment on August 23, 2007, she did show early signs of improved sleep, but she felt more tired, she was still sad, her depressed mood was unchanged, her paranoia was unchanged, she continued to have nightmares, and her insight and judgment were only fair.  (Tr. at 211.)  On September 25, 2007, plaintiff reported a slight decrease in insomnia, as she was sleeping five hours a night with fewer nightmares, her sadness was slightly reduced, and her insight and judgment were good, but her mood was still depressed and her medication dosage was increased.  (Tr. at 210.)  In November 2007, the Remeron dosage was decreased and Lexapro was added; in January 2008, the Lexapro dosage was increased.  (Tr. at 209.)

In February 2008, Dr. Lim completed a "Mental Impairment Questionnaire (RFC and Listings)."  (Tr. at 201-06.)  The ALJ's step-two analysis makes no mention of this questionnaire.  In the form, Dr. Lim indicates that he had been seeing plaintiff every six weeks since August 15, 2007, his diagnoses were major depressive disorder and PTSD, and he was

1   awaiting plaintiff's response to an increased dosage of Lexapro.  (Tr. at 201.)  His clinical

2   findings as of February 2008 were that plaintiff was getting only four to five hours of sleep each

3   night, that she has fatigue, low back pain, poor memory and concentration, and that she is sad

4   most of the time.  (Tr. at 201.)  After treating plaintiff for over six months, Dr. Lim anticipated a

5   twelve- to sixteen-month treatment course.  (Tr. at 201.)  He identified plaintiff's signs and

6   symptoms as anhedonia, appetite disturbance, decreased energy, thoughts of suicide, feelings of

7   guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, recurrent and

8   intrusive recollections of a traumatic experience that are a source of marked distress, persistent

9   disturbances of mood or affect, apprehensive expectation, vigilance and scanning, memory

10   impairment, and sleep disturbance.  (Tr. at 202.)

11           With respect to the mental abilities and aptitudes needed to do unskilled work, Dr.

12   Lim's opinion was that plaintiff had no useful ability to (1) remember work-like procedures, (2)

13   understand and remember very short and simple instructions, (3) carry out very short and simple

14   instructions, (4) work in coordination with or proximity to others without being unduly

15   distracted, (5) complete a normal workday and workweek without interruptions from

16   psychologically based symptoms, (6) perform at a consistent pace without an unreasonable

17   number and length of rest periods, (7) ask simple questions or request assistance, (8) accept

18   instructions and respond appropriately to criticism from supervisors, or (9) get along with co-

19   workers or peers without unduly distracting them or exhibiting behavioral extremes.  It was his

20   opinion that plaintiff was also unable to meet competitive standards with respect to the abilities

21   to maintain attention for a two-hour segment, sustain an ordinary routine without special

22   supervision, make simple work-related decisions, respond appropriately to changes in a routine

23   work setting, deal with normal work stress, and be aware of normal hazards and take appropriate

24   precautions.  Dr. Lim explained that these limitations were caused by plaintiff's poor memory

25   and concentration as well as her short attention span.  He believed that plaintiff had a limited but

26   satisfactory ability to maintain regular attendance and be punctual within customary, usually

strict tolerances.  (Tr. at 203.)

With respect to the mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Lim's opinion was – again because of her poor memory and concentration – that plaintiff had no useful ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) set realistic goals or make plans independently of others, or (4) deal with the stress of semiskilled and skilled work.  (Tr. at 204.)

Finally, with respect to the mental abilities and aptitude needed to do particular types of jobs, Dr. Lim's opinion was that plaintiff had no useful ability to (1) interact appropriately with the general public, (2) maintain socially appropriate behavior, (3) adhere to basic standards of neatness and cleanliness, (4) travel in unfamiliar places, and (5) use public transportation.  As to the latter, Dr. Lim noted that plaintiff was unable to ride public transportation due to her fears of getting lost.  (Tr. at 204.)

Dr. Lim opined that plaintiff has reduced intellectual functioning because she had no formal schooling and her psychiatric condition exacerbates her experience of severe back pain and prevents her from standing for long periods of time.  (Tr. at 204.)  In his opinion, as a result of plaintiff's mental impairments, functional limitations exist in the following areas to an extreme degree:  restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  (Tr. at 205.)  Dr. Lim stated that plaintiff had experienced within a twelve-month period four or more episodes of decompensation, i.e., exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, with each episode lasting at least two weeks.  Dr. Lim found that plaintiff has a medically documented history of an affective disorder of at least two years' duration that causes more than a minimal limitation of ability to do any basic work activity and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  Dr. Lim also found that plaintiff has an anxiety related disorder and a complete inability to function independently

13

outside the area of her home.  (Tr. at 205.)  He anticipated that plaintiff's impairments would cause her to be absent from work more than four days per month and that the impairments had lasted or could be expected to last at least twelve months.  (Tr. at 206.)  It was Dr. Lim's opinion that plaintiff is not a malingerer and that her impairments are reasonably consistent with the symptoms and functional limitations described in his evaluation of her.  He opined further that plaintiff's limited ability to speak English and low level of education are additional reasons why plaintiff would have difficulty working at a regular job on a sustained basis.  (Tr. at 206.)

Dr. Lim's opinion of plaintiff's functional limitations stands in stark contrast to the ALJ's determination that, in the four areas of functioning, plaintiff has no more than mild limitations in daily activities, social functioning and concentration, persistence and pace and has not experienced any episodes of decompensation.  (Tr. at 13.)  The ALJ did not cite the opinion of any physician as support for the determination that plaintiff's mental functional limitations are mild.  Instead, the ALJ appears to have drawn her own medical conclusions, finding that plaintiff

> has seven children still at home, including a toddler and other young children.  Young children can be quite demanding both physically and mentally.  While she alleges that she does not care for them, that the older children care for the younger children, her credibility is suspect following her lack of cooperation at the mental examination.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Second, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other facts discussed in this decision.  Overall, the claimant's reported limited daily activities, social activities, and concentration, persistence and pace are considered to be outweighed by the other factors discussed in this decision.

(Tr. at 13.)

Plaintiff contends that the ALJ found her mental impairments "nonsevere" only by improperly rejecting the opinions of Dr. Lim.  The court agrees.  It is well established that the weight to be given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant . . . ." Id.  A treating doctor is employed to cure and has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990).  Of course, the ALJ need not give controlling weight to conclusory opinions supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113-14 (9th Cir. 1999); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

"At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons."  Lester, 81 F.3d at 830 (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing."  Lester, 81 F.3d at 830 (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  If a treating professional's opinion is contradicted by an examining professional's opinion that is supported by different, independent clinical findings, the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes, 881 F.2d at 751).  The opinion of a non-examining professional, without other evidence, is an insufficient basis for rejecting the opinion of either a treating or examining professional.  Lester, 81 F.3d at 831.

Here, in determining that plaintiff has no severe mental impairment, the ALJ cited lack of evidence of treatment or allegations of mental impairments to treating sources prior to October 2006, malingered test results on October 16, 2006, and lack of evidence of treatment for mental health prior to August 15, 2007.  For the reasons set forth above, these assertions do not support a conclusion that plaintiff has no severe mental impairment.[2]

/////

---

[2]  The ALJ also asserted that plaintiff showed improvement after being seen by Dr. Lim a few times.  That assertion is contradicted by the record, as set forth supra.

1     The ALJ's tacit rejection of Dr. Lim's opinions at step two of the analysis was

2  expressed by the ALJ at step four as follows:

3           As for the opinion evidence, the assessment by the physicians at
            Disability Determination Services is afforded controlling weight as
4           it is supported by the evidence of record.  The assessment by Dr.
            Lim that the claimant is unable to sustain any work activity due to
5           her mental impairment and that she would likely miss more than
            more than [sic] four days per month is not afforded weight.
6           Although Dr. Lim is a treating source, his own treating records do
            not support this extreme assessment.  As shown above in the B
7           criteria, objective findings were minimal with only conservative
            treatment and after only a month of treatment, her symptoms were
8           improving (page 127 [tr. at 210]).  Therefore, the opinion by Dr.
            Lim is not afforded controlling weight.
9

10 (Tr. at 15.)

11     In so concluding, the ALJ did not include any citation to the record for the DDS

12 assessment relied upon.  However, the court finds only one DDS mental health assessment in the

13 record:  a Psychiatric Review Technique form dated November 13, 2006, unsigned but

14 apparently completed by H.N. Hurwitz, M.D.  (Tr. at 283-93.)  The eleven-page form contains

15 marks in two boxes on the first page, no marks at all on any other page, and no written entries on

16 any page except that on page one the word "current" has been inserted to indicate that the

17 assessment is from an unspecified date to the date of completion of the form.  The boxes marked

18 on page 1 indicate "No Medically Determinable Impairment" and "These findings complete the

19 medical portion of the disability determination."  (Tr. at 283.)

20     The ALJ's reliance on a form completed in 2006 by a non-treating, non-

21 examining agency physician is both factually and legally flawed.  Such reliance violates the

22 general rule that more weight should be given to the opinion of a treating source than to the

23 opinion of doctors who do not treat the claimant and fails to recognize that a treating doctor has a

24 greater opportunity to know and observe the patient as an individual.  Here, the treating doctor's

25 /////

26 /////

16

1  opinion has not been contradicted by any other doctor's opinion[3], and the DDS physician does

2  not appear to have had access to any of the relevant evidence in the record.  Certainly, the ALJ

3  did not offer specific and legitimate reasons for rejecting Dr. Lim's opinion in favor of the out-

4  dated opinion of a non-treating, non-examining physician.  The ALJ also violated the rule that

5  the opinion of a non-examining professional, without other evidence, is an insufficient basis for

6  rejecting the opinion of either a treating or examining professional.

7          Accordingly, the court finds that the ALJ's reasons for rejecting Dr. Lim's

8  opinions are not legitimate reasons supported by substantial evidence in the record.  No medical

9  evidence in the record clearly establishes that plaintiff's mental impairments are slight

10 abnormalities that have no more than a minimal effect on her ability to work.  Rather, Dr. Lim's

11 opinions and treatment records require a conclusion that plaintiff's major depression and PTSD

12 are severe impairments for which adjudication must continue through the sequential evaluation

13 process.  In reaching this conclusion, the court is mindful that the step-two inquiry is "a de

14 minimis screening device to dispose of groundless claims."  Smolen, 80 F.3d at 1290 (citing

15 Yuckert, 482 U.S. at 153-54).  The record demonstrates that the mental impairments asserted by

16 plaintiff are not groundless.  Plaintiff's argument that the ALJ rejected the opinions of her

17 treating psychiatrist without a legitimate basis is persuasive, and plaintiff's motion for summary

18 judgment will be granted on that ground.

19 **II.     Steps Four and Five:  Residual Functional Capacity and Ability to Work**

20          Plaintiff's second and third arguments challenge the ALJ's ultimate

21 determinations that plaintiff has the residual functional capacity to perform the full range of light

22 work and that work exists in significant numbers in the national economy that plaintiff can

23 perform.  Plaintiff contends that the ALJ failed to properly evaluate and credit plaintiff's

24 testimony and the third-party statements of her son regarding the nature and extent of her

25

26       [3]  As noted, Dr. Nakagawa was unable to express any opinion other than her belief that
    plaintiff was malingering on the day they met.

1  functional limitations, and improperly used the grids.

2      A claimant's RFC is "the most [the claimant] can still do despite [his or her]

3  limitations." 20 C.F.R. § 404.1545(a). The assessment of RFC must be "based on all the

4  relevant evidence in [the claimant's] case record." Id. See also Mayes v. Massanari, 276 F.3d

5  453, 460 (9th Cir. 2001). Where the claimant has a mental impairment that does not meet or

6  equal a listed impairment but is more than "not severe," the claimant's mental RFC must be

7  determined by considering evidence such as information from medical sources, reports of the

8  individual's activities, and testimony of third parties about the individual's performance and

9  behavior. Social Security Ruling (SSR) 85-16, 1985 WL 56855, at *1-2 (1985). "[T]he

10 individual's RFC must be considered in conjunction with the individual's age, education, and

11 work experience." Id. at *2. "[E]vidence that an individual is markedly withdrawn or seclusive

12 suggests a greatly reduced capacity for close contact and interaction with other people," and

13 "individuals with paranoid tendencies may be expected to experience moderate to moderately

14 severe difficulties in relating to coworkers or supervisors, or in tolerating normal work

15 pressures." Id. at *3. Since treating medical sources often have a great deal of information about

16 the development and progress of an individual's impairment, as well as the individual's response

17 to treatment, "[e]very reasonable effort should be made to obtain all medical evidence from the

18 treating source . . . before obtaining evidence from any other source on a consultative basis." Id.

19 To assess the effects of mental impairment, relevant and reliable information obtained from third

20 party sources such as family members may play an important role in assessing the individual's

21 level of activities of daily living. Id. at *4.

22     **A. <u>Testimony</u>**

23     Once a claimant has presented medical evidence of an underlying impairment, the

24 ALJ may not discredit the claimant's testimony as to the severity of her symptoms merely

25 because the symptoms are unsupported by objective medical evidence. Reddick v. Chater, 157

26 F.3d 715, 722 (9th Cir. 1998); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

Indeed, "'the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'" Light, 119 F.3d at 792 (quoting Smolen, 80 F.3d at 1281).  See also Morgan, 169 F.3d at 599; Reddick, 157 F.3d at 722; Matthews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993) (citing Miller, 770 F.2d at 848).

In evaluating a claimant's subjective testimony regarding pain and the severity of his symptoms, the ALJ may consider the presence or absence of supporting objective medical evidence along with many other factors.  Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc); Smolen, 80 F.3d at 1285.  The ALJ may also rely in part on his or her own observations.  Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989).  However, the ALJ cannot substitute such observations for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177 n.6 (9th Cir. 1990).

With respect to daily activities, it is well established that social security claimants need not be "utterly incapacitated to be eligible for benefits."  Fair, 885 F.2d at 603.  See also Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005); Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").  In general, the Commissioner does not consider "activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs" to be substantial gainful activities.  20 C.F.R. § 404.1572(c).  See also 20 C.F.R. § 404.1545(e).  Daily activities may be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007).  In order to conclude that the claimant's activities warrant an adverse credibility determination, however, the ALJ must make specific findings relating to the claimant's daily activities and the transferability of those activities to the work setting.  Id.

1          The testimony of lay witnesses, including a claimant's family members, reflecting

2     their own observations of how the claimant's impairments affect his activities must be

3     considered and discussed by the ALJ.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir.

4     2006); Smolen, 80 F.3d at 1288; Sprague, 812 F.2d at 1232.  Friends and family members who

5     see the claimant on a daily basis are competent to testify as to their observations.  Regennitter v.

6     Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999); Dodrill v. Shalala, 12 F.3d

7     915, 918-19 (9th Cir. 1993).  If the ALJ chooses to reject or discount the testimony of a lay

8     witness, he or she must give reasons germane to each particular witness.  Regennitter, 166 F.3d

9     at 1298; Dodrill, 12 F.3d at 919.  The mere fact that a lay witness is a relative of the claimant

10    cannot be a ground for rejecting the witness's testimony.  Regennitter, 166 F.3d at 1298; Smolen,

11    80 F.3d at 1289.  Nor does the fact that medical records do not corroborate the testimony provide

12    a proper basis for rejecting such testimony.  Smolen, 80 F.3d at 1289.  It is especially important

13    for the ALJ to consider lay witness testimony from third parties where a claimant alleges

14    symptoms not supported by medical evidence in the file and the third parties have knowledge of

15    the claimant's daily activities.  20 C.F.R. § 404.1513(e)(2); SSR 88-13.

16          Questions of credibility and the resolution of conflicts in the testimony are usually

17    deemed functions solely of the Commissioner.  Morgan, 169 F.3d at 599.  The determination of

18    credibility is said to be a function of the ALJ acting on behalf of the Commissioner.  Saelee v.

19    Chater, 94 F.3d 520, 522 (9th Cir. 1996).  As a general rule, an ALJ's assessment of credibility

20    should be given great weight.  Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985).  Ordinary

21    techniques of credibility evaluation may be employed, and the adjudicator may take into account

22    prior inconsistent statements or a lack of candor by the witness.  Fair, 885 F.2d at 604 n.5.

23    Absent affirmative evidence of malingering, however, the ALJ's reasons for rejecting the

24    claimant's testimony must be clear and convincing.  Morgan, 169 F.3d at 599.

25          Here, the ALJ found that plaintiff suffered from mild degenerative disc disease of

26    the lumbar spine, GERD, and hypertension, which, in combination, caused significant limitations

to plaintiff's ability to perform basic physical work activities.  (Tr. at 12.)  The ALJ erroneously

found that plaintiff's medically determinable mental impairments of depressive disorder and

PTSD were not severe and did not cause more than minimal limitation in her ability to perform

basic mental work activities.  (Tr. at 13.)  In discussing plaintiff's functioning at step two of the

sequential evaluation process, the ALJ described plaintiff's credibility as "suspect following her

lack of cooperation at the mental examination" conducted by Dr. Nakagawa, despite the fact that

the record does not reveal any other occasion when plaintiff was uncooperative and plaintiff's

treating psychiatrist and Dr. Sharma, the consultative medical examiner who examined her less

than two weeks prior to Dr. Nakagawa's evaluation, found plaintiff cooperative and reliable.  (Tr.

at 206, 210-11, 215-18, 312-17.)  The ALJ next observed that plaintiff's "allegedly limited daily

activities cannot be objectively verified with any reasonable certainty" but that,

> even if the claimant's daily activities are truly as limited as alleged,
> it is difficult to attribute that degree of limitation to the claimant's
> medical condition, as opposed to other reasons, in view of the
> relatively weak medical evidence and other factors discussed in
> this decision.  Overall, the claimant's reported limited daily
> activities, social activities, and concentration, persistence and pace
> are considered to be outweighed by the other factors discussed in
> this decision.

(Tr. at 13.)  The ALJ found that plaintiff's medically determinable impairments "could

reasonably be expected to produce the alleged symptoms" but hat plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible" to

the extent that they are inconsistent with the ALJ's physical RFC assessment.  (Tr. at 14-15.)

The ALJ's unfavorable conclusion regarding plaintiff's credibility is based

primarily on Dr. Nakagawa's determination that plaintiff malingered during tests conducted on

October 16, 2006, as well as on the ALJ's erroneous assessment of plaintiff's mental impairment

and unwillingness to believe plaintiff's testimony about the intensity, persistence, and limiting

effects of her symptoms.  The court finds that the ALJ rejected plaintiff's testimony about the

severity of her symptoms without offering specific, clear and convincing reasons for doing so.

The ALJ's decision contains no mention of the "Function Report - Adult - Third Party" completed by Kou Vang, plaintiff's son, on July 23, 2006. (Tr. at 151-58.) Kou reports that plaintiff cannot do anything, stays at home most of the time, and watches the younger children while Kou is at school, although sometimes she lies on the sofa all day. (Tr. at 151.) According to Kou, he and his father help with everything around the house because his mother cannot cook, clean, stand or walk for a long time, or lift heavy things. (Tr. at 152.) Kou's father must remind plaintiff to change her clothes, to take showers, and to take her medications. (Tr. at 153.) Kou's mother used to cook but can no longer stand for very long, walk a long time, lift, bend down, concentrate, or focus. (Id.) Kou states that when his mother feels better she sometimes does chores such as dusting or picking up trash. (Id.) His mother cannot read or write and would not be able to pass a driving test. (Tr. at 154.) Kuo reported that plaintiff cannot sit still in one place for very long, so she changes position, which prevents her from concentrating on what she is doing or watching. (Tr. at 155.) He stated that his mother sometimes gets very angry and yells at everyone in the house for no reason. (Tr. at 156.) She can only walk for about ten or fifteen minutes before having to rest. (Id.) Kou's third-party observations corroborate plaintiff's own written report and testimony, and are also consistent with Dr. Lim's assessment of plaintiff's functional limitations. The ALJ's complete failure to address the third-party statement of Kou Vang, a family member who sees plaintiff on a daily basis and is competent to testify as to his observations, is inconsistent with applicable law.

The court finds that the ALJ erred in rejecting plaintiff's subjective testimony regarding her limitations and in failing to address the third-party statement of plaintiff's son regarding plaintiff's functional limitations. Because the ALJ did not provide clear and convincing reasons for finding plaintiff's testimony not credible or for disregarding the third-party statement by plaintiff's son, substantial evidence does not support the ALJ's assessment that plaintiff is capable of performing the full range of light work without restriction. The court concludes that plaintiff is entitled to summary judgment on her argument that the ALJ failed to

1   properly evaluate and credit her testimony and failed to address the third-party statement of her

2   son regarding plaintiff's functional limitations.

3     **B.  Use of the Grids**

4      After determining that plaintiff had the residual functional capacity to perform the

5   full range of light work, the ALJ proceeded to the fifth step of the sequential evaluation process.

6   At step five, the Commissioner may satisfy his burden of showing that the claimant can perform

7   other types of work in the national economy, given the claimant's age, education, and work

8   experience, by applying the Medical-Vocational Guidelines, if appropriate, or by taking the

9   testimony of a vocational expert.  Burkhart, 856 F.2d at 1340; Polny v. Bowen, 864 F.2d 661,

10  663 (9th Cir. 1988).

11     "The grids are an administrative tool the Secretary may rely on when considering

12  claimants with substantially uniform levels of impairment."  Burkhart, 856 F.2d at 1340.  The

13  grids reflect "major functional and vocational patterns" and incorporate the analysis of critical

14  vocational factors, i.e., age, education, and work experience, in combination with the individual's

15  residual functional capacity.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a).  The grids may be

16  utilized when they "'accurately and completely describe the claimant's abilities and limitations.'"

17  Burkhart, 856 F.2d at 1340 (quoting Jones, 760 F.2d at 998).  "When a claimant's nonexertional

18  limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the

19  claimant's exertional limitations, the grids are inapplicable. . . .  In such instances, the Secretary

20  must take the testimony of a vocational expert and identify specific jobs within the claimant's

21  capabilities."  Burkhart, 856 F.2d at 1340 (quoting Desrosiers v. Sec'y of Health & Human Svcs.,

22  846 F.2d 573, 577 (9th Cir. 1988)).  See also Aukland v. Massanari, 257 F.3d 1033, 1035 (9th

23  Cir. 2001) (holding that "an ALJ may rely solely on the Medical-Vocational Guidelines (the

24  'grids') only when a claimant can perform the full range of applicable work" and the ALJ erred

25  in failing to obtain the testimony of a vocational expert).

26  /////

1          Here, the court has determined that plaintiff is entitled to summary judgment on

2    her claim that the ALJ rejected the opinions of plaintiff's treating psychiatrist and found

3    plaintiff's mental impairments to be "non-severe," without a legitimate basis for doing so.  The

4    court has also determined that plaintiff is entitled to summary judgment on her claim that the

5    ALJ failed to properly evaluate and credit plaintiff's testimony and the third-party statements of

6    plaintiff's son regarding the nature and extent of her functional limitations.  The ALJ's errors led

7    to an erroneous conclusion that plaintiff had the ability to perform the full range of light work.  If

8    Dr. Lim's opinions are properly credited, plaintiff's mental impairments are properly recognized

9    as severe at step two, and plaintiff's testimony and her son's third-party statements are properly

10   credited, use of the grids will be inappropriate and the services of a vocational expert will be

11   required in order to determine whether plaintiff is capable of performing any work on a sustained

12   basis.  The court therefore finds that plaintiff is also entitled to summary judgment on her claim

13   that the ALJ erred in using the grids and failing to secure the testimony of a vocational expert.

14                                    **CONCLUSION**

15         The court finds that remand is required so that plaintiff's medically determinable

16   mental impairments of major depressive disorder and PTSD can be considered at all steps of the

17   sequential analysis, along with her physical impairments.  At step two, the ALJ shall include as

18   severe impairments all physical impairments previously found to be severe and the mental

19   impairments diagnosed by Dr. Lim, as the record demonstrates that these impairments are not

20   slight abnormalities having no more than a minimal effect on plaintiff's ability to work.  The ALJ

21   shall give proper weight to the opinions of Dr. Lim, plaintiff's treating psychiatrist, as set forth in

22   this order.  It will be necessary at step three to consider whether plaintiff's mental impairments,

23   individually or in combination, meet the requirements of any listed mental impairment.  If

24   plaintiff's impairments do not meet or equal any listing, the ALJ shall reconsider and credit

25   plaintiff's subjective symptom testimony and discuss the written statements of plaintiff's son,

26   Kou Vang.  The ALJ shall redetermine plaintiff's residual functional capacity in light of all of

1   plaintiff's impairments and the entire record.  If the sequential evaluation proceeds to step five on

2   remand, the ALJ shall hold a new hearing at which the testimony of a vocational expert is

3   secured.

4                   Accordingly, IT IS HEREBY ORDERED that:

5                   1.  Plaintiff's motion for summary judgment (Doc. No. 22) is granted;

6                   2.  Defendant's cross-motion for summary judgment (Doc. No. 29) is denied;

7                   3.  The decision of the Commissioner of Social Security is reversed; and

8                   4.  This case is remanded for further proceedings consistent with this order.

9   DATED: July 22, 2010.

10

11

12                           DALE A. DROZD

                              UNITED STATES MAGISTRATE JUDGE

13   DAD:kw

    Ddad1/orders.socsec/vang2557.order

14

15

16

17

18

19

20

21

22

23

24

25

26